## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:24-cr-275 (TSC)** |
| **IFEDIORA OLI,** | |
| *Defendant.* | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, through the undersigned counsel, respectfully submits the following sentencing memorandum.  The Defendant, Ifediora Oli, pled guilty to devising and executing a multiyear conspiracy through which his private company earned over $1 million in funds originating from fraudulently obtained government contracts.  To conceal and continue his brazen criminal conduct for over half a decade, Oli repeatedly lied to his full-time federal government employer and falsified annual ethics disclosures.  Oli's pre-indictment resolution with the Government and the parties' agreed-upon estimated guideline range under the United States Sentencing Guidelines ("U.S.S.G.") reflect a sentence that would be sufficient, but not greater than necessary, to achieve the statutory purposes of punishment such as deterring future acts of fraud and corruption and promoting respect for the rule of law.  For those and other reasons described below, the Government requests that the Court impose a guideline sentence of between 21- and 27-months imprisonment.

### I.      RELEVANT BACKGROUND

#### a.  Highbury & Relationship with Co-Conspirators

The charges against Oli cover actions he took from January 2018 through December 2023.  *See* ECF No. 15 at 1.  During that period, Oli worked full-time at the United States Department of Agriculture ("USDA").  Unbeknownst to USDA, Oli was simultaneously obtaining additional

1

money through his private business, Highbury Global Group, Inc. ("Highbury").  Both ventures—

his employment at USDA and attempts to get work with Highbury—date back to 2015.  *See* ECF

No. 22 at 16; *see also* Ex. 1.

Oli's friend and co-conspirator, Obinna Ogbu, began working at the Washington

Metropolitan Area Transit Authority ("WMATA") in 2016.  Ogbu worked in WMATA's

Information Technology ("IT") department.  Ogbu had a romantic relationship with another

WMATA employee, Bridgette Crowell, who would ultimately join the conspiracy.

As both Oli and Ogbu admit, beginning in 2018, they agreed to use Ogbu's position at

WMATA and access to Crowell to steer government contracting business to Highbury.  *See* ECF

No. 19 at ¶ 8 (hereinafter "Oli Stmt."); *United States v. Ogbu*, Case No. 24-cr-255 (TSC), ECF

No. 7 at ¶ 8 (hereinafter "Ogbu Stmt.").  In exchange, Oli gave things of value to Ogbu.  *Id*.

Throughout the conspiracy, Oli used his co-conspirators' authority over government-

contracting processes to fraudulently obtain business for Highbury and enrich himself.

**b.  WMATA IT Helpdesk Support Services Contract**

In January 2018, Ogbu was designated as a Contracting Officer Technical Representative

("COTR") for a WMATA contract seeking support services for WMATA's IT Helpdesk (the "IT

Helpdesk Support Services Contract").  *See* Oli Stmt. at ¶ 9.  Ogbu's duties as COTR for the

contract were broad.  They included: being the principal point of contact with the contractor;

reviewing and approving invoices and bringing discrepancies or disputes to the attention of the

contracting officer; and executing a vendor evaluation at the close of the contract.  *See* Ex. 2 at 2.

As COTR, Ogbu was prohibited from taking actions that could cause the appearance of a conflict

of interest, including: "making commitments or promises to contractors relating to award of

contracts"; "directing changes outside of stated contractual obligations"; "executing supplemental

agreements"; and discussing "advance information that might provide preferential treatment to one firm over another." *Id*. at 3. Notably, under the terms of Ogbu's COTR designation, Crowell was the WMATA Contract Administrator to whom Ogbu was to direct his questions. *Id*. a 1. Ogbu also led the Technical Evaluation Team ("TET") for the contract. The TET, and thus Ogbu, played a critical role in helping select the contract vendor.

As part of his duties, Ogbu drafted the statement of work for the IT Helpdesk Support Services Contract. *See* Oli Stmt. at ¶ 10. WMATA awarded the contract to a private company. *Id*. at ¶ 11. Ogbu abused his position to get that company to use Highbury as a sub-contractor under the contract. *Id*. Over a two-year period, that company paid Highbury just shy of $90,000 under the arrangement. *Id*. at ¶ 12. In return, Oli gave Ogbu cash and other things of value. *Id*.

### c. WMATA IT Staff Augmentation Contract

Oli would make even more money from a corrupt sub-contracting arrangement related to WMATA efforts to get contractors to help support the staff WMATA used for IT-related services (the "IT Staff Augmentation Contract").

The IT Staff Augmentation Contract stemmed from a basic ordering agreement ("BOA"), which was a global framework outlining the terms and conditions for certain future WMATA contracts. Ogbu used his position to draft an independent cost estimate ("ICE") for a task order to be funded through that BOA. *See* Oli Stmt. at ¶ 14. That task order allowed WMATA to contract for additional IT positions that would be staffed by external contractors working under Ogbu's supervision in the WMATA IT Department. *Id*. After drafting the material, but before it was public or officially posted for competitive bidding, Ogbu shared it with Oli. *Id*.; *see also* Ex. 3. Ogbu sent that material to Oli on September 4, 2018. *Id*. Ogbu noted for Oli that the "[c]lock will start ticking at some point this week." *Id*. Two weeks later, Oli reached out to a potential prime

contractor to discuss "a few opportunities at WMATA coming in soon." Ex. 4.  Oli informed the prime contractor that the "opening would be on asset management," and Oli was "very optimistic on these new postings coming." *Id*.

Oli had ample, albeit nefarious, reasons to be "very optimistic" about the posting.  With the inside track secured, Oli worked with potential prime contractors to get them to bid on the IT Staff Augmentation Contract.  The prime contractors submitted those bids with an understanding that Highbury, acting as a sub-contractor, would provide the individuals who would do work under the contract—and thus under Ogbu's supervision.  *See* Oli Stmt. at ¶¶ 14-15.[1]

The IT Staff Augmentation Contract aspect of the conspiracy went on for years.  For Oli and Ogbu, the process was safely (and corruptly) circular—and it became routine.  First, Oli and Ogbu covertly coordinated to identify and decide which candidates Highbury would submit to prime contractors for the prime contractors to include in their bids to WMATA.  *See* Oli Stmt. at ¶ 16.[2]  They then helped those candidates prepare for the selection process—at one point, Ogbu even provided likely interview questions to Oli.  Once the prime contractors submitted their bids (with the candidates Oli and Ogbu had pre-selected), Ogbu used his inside position at WMATA to select those candidates.  *See* Oli Stmt. at ¶ 17.[3]  Once selected, those candidates then worked under Ogbu's supervision.  The money approved to pay those individuals went from WMATA through a prime contractor to Highbury and Oli.[4]

---

[1] *See also* Ex. 5 (October 2018 email in which Oli and Ogbu shared edits on a Highbury sub-contracting agreement with a prime contractor to be used as part of Highbury's efforts to get business under the IT Staff Augmentation Contract).

[2] *See also e.g.*, Ex. 6 (Nov. 2022 text messages in which Oli and Ogbu discuss potential candidates for prime contractors to submit).

[3] *See also e.g.*, Ex. 7 (Ogbu's November 2022 WMATA technical evaluation recommending the candidates he had just discussed in text messages with Oli).

[4] The selected contractors did provide services to WMATA.  But in addition to supervising them, Ogbu was able to work with Oli to control (and if so desired, artificially inflate) the number of hours they worked and the stated benefit to WMATA from their services.

Oli carried out this aspect of the conspiracy from 2018 to 2023.  During that time, Highbury made over $400,000 in funds stemming from the IT Staff Augmentation Contract.  *See* Oli Stmt. at ¶ 18.  As Highbury and Oli got paid, Oli in turn paid Ogbu.  *Id*.

### d.  Fraud and Corruption Through OCP

Having been introduced to Crowell in 2018, Oli maintained a line of communication with her as the conspiracy expanded.[5]  By January 2021, Crowell was working at the District of Columbia's Office of Contracting and Procurement ("OCP") as a contracting specialist and was fully in the conspiracy with Oli and Ogbu.  With an obvious understanding that she would personally benefit from misusing her position to enrich Highbury, Crowell fed inside OCP information and steered lucrative District contracting opportunities to Oli.  Through Crowell's malfeasance, Oli and Highbury fraudulently obtained a contract to provide the District's Department of Forensic Services ("DFS") with COVID-19 testing supplies (the "COVID-19 Testing Supplies Contract").  *See* Oli Stmt. at ¶ 19.

Oli and his co-conspirators understood that Oli would reward Crowell for her role in improperly steering the contract to Highbury.  *Id*.  For example, on June 7, 2021, the District sent a $234,790.59 check to Highbury.  *See* Ex. 8.  On June 14, 2021, Oli took a picture of the check and sent the picture to Ogbu.  *Id*.  Oli then asked Ogbu for his bank account details. Shortly thereafter, Oli wired $55,000 to Ogbu.  *Id*.  In the text messages, Oli instructed Ogbu to give "5k" to Crowell. Oli further instructed that the money to Crowell had to be provided in cash. Within hours of receiving that message, Ogbu responded that he had delivered the money to Crowell and that "she says Thank You."  *Id*.

---

[5] Notably, before leaving WMATA in 2019, Crowell often carried out responsibilities related to Highbury's work on the IT Staff Augmentation Contract.  And after 2019, Oli tried to engage Crowell to help him draft bid proposals.

The District of Columbia paid Highbury over $630,000 on the contract. Oli passed $100,000 of that on to Ogbu and instructed Ogbu to give $15,000 of that to Crowell. *See* Oli Stmt. at ¶ 21.

As the conspirators were benefiting from the COVID-19 Testing Supplies Contract, Crowell alerted Oli and Ogbu that the District planned to issue a solicitation involving third-party procurement of certain bi-directional amplifier monitoring services (the "BDA Contract"). *Id*. at ¶ 22. The conspirators agreed to coordinate on the submission of multiple bids on the contract— bids that were drafted with pre-award nonpublic information that Crowell improperly provided to Oli and Ogbu. *Id*. Highbury was not awarded the BDA Contract. But at the time that Oli submitted the fraudulent BDA Contract bid in the fall of 2021, he was simultaneously benefiting from corruptly obtained contracts for Highbury with both WMATA (*i.e.*, the IT Staff Augmentation Contract) and OCP (*i.e.*, the COVID-19 Testing Supplies Contract).

### e. Falsification of Records and Obstruction of Justice

To obtain lucrative government contracts for Highbury, Oli had to engage in repeated fraud. As Oli admits, this included falsifying WMATA and District contracting documents to conceal his and Highbury's connections to Ogbu and Crowell. *See* Oli Stmt. at ¶ 25.

To continue his criminal conduct without detection, Oli had to conceal from his full-time employer the elicit proceeds he was obtaining through his private company. As Oli admits, this included repeatedly falsifying an annual ethics form he was required to submit to the USDA. *Id*. at ¶¶ 26-28. Specifically, he falsified a U.S. Office of Government Ethics ("OGE") form referred to as the "OGE Form 450" once a year for every year between 2019 and 2024. *Id*. His conviction on Count Two of the Information (violation of 18 U.S.C. § 1519) addresses his criminal falsification of one such form in 2023. *See* ECF No. 15 at 2.

Oli also lied to special agents from the Federal Bureau of Investigation ("FBI") when they first approached him and asked him about his criminal conduct.  *See* Oli Stmt. at ¶ 29.

### f.  Procedural Background

The federal investigation into this matter began after WMATA's Office of Inspector General ("WMATA-OIG") was informed of potential misconduct by Ogbu at WMATA.  As more information was learned, WMATA-OIG and the FBI were joined in their investigative efforts by the District of Columbia's Office of the Inspector General ("DC-OIG").  By late 2023, investigators had clearly identified Oli as the central beneficiary of Crowell's and Ogbu's corruption.

In February 2024, investigators approached the three co-conspirators while executing court-approved search warrants at their respective residences.  After the searches, each co-conspirator obtained counsel.  On March 21, 2024, the Government informed Oli's attorney that Oli was a target of a federal criminal investigation and was facing potential prosecution for offenses such as conspiracy, bribery, theft of public money, fraud, bid-rigging, obstruction of justice, and falsification of records.  A few days later, the Government learned that Oli had made plans to travel to Nigeria.  Fearing that he may be seeking to flee prosecution, the Government filed a criminal complaint charging him with conspiracy and obtained a warrant for his arrest.  Oli was arrested on April 2, 2024.[6]

Oli's co-conspirators quickly grasped the strength of the Government's case and the wrongfulness of their actions.  Ogbu pled guilty to conspiracy on May 31, 2024.  Crowell pled guilty to the same offense a week later.  After Ogbu and Crowell publicly entered their pleas, Oli

---

[6] After the arrest, the Government learned that Oli's travel coincided with the death of his father.  *See* ECF No. 14 at 1.  But as the Government later explained, it feared that Oli's criminal exposure, his awareness of that exposure, his means and resources, and his ties to Nigeria made him a long-term flight risk even if his immediate reason for traveling to Nigeria were not based on this criminal matter.  *Id.*

agreed to enter a guilty plea to a two-count Superseding Information that charged him with: (1) conspiracy to commit money, property, and honest services wire fraud, in violation of 18 U.S.C. § 1349; and (2) falsification of records, in violation of 18 U.S.C. § 1519.

As noted below, the Government credits him with full and timely acceptance of responsibility.  However, the Government is doubtful that Oli would have accepted responsibility for his criminal conduct had his co-conspirators not done so first.

## II.    SENTENCING FRAMEWORK

To determine Oli's sentence, the Court should first calculate the applicable federal advisory guideline range for the offense.  *See Gall v. United States*, 552 U.S. 38, 49-50 (2007).  Because that guideline range is meant to "secure nationwide consistency" and is "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing determinations," that range should serve as an "initial benchmark" for the sentence.  *Id.* at 47-50.

After determining the guideline range, the Court must consider the various factors set forth in 18 U.S.C. § 3553(a).  The factors include: the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense and promote respect for the law; the need for the sentence to afford adequate deterrence; and the kinds of sentences available and need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  *See generally* 18 U.S.C. § 3553(a).  The inquiry is focused on fashioning a sentence that is "sufficient, but not greater than necessary" to advance the § 3553(a) factors, which in turn reflect the purposes of punishment.  *Id*.

### III.   AGREED-UPON GUIDELINE ANALYSIS

The parties agree on the U.S.S.G. analysis applicable in this case.  *See generally* ECF No. 18 at 2-3.  The Probation Department also agrees with that analysis.  *See* ECF No. 25 at 11-12. The applicable guidelines are:

| GROUP 1: 18 U.S.C. § 1349 (Count One) | | |
|---|---|---|
| Base Offense Level | U.S.S.G. §2B1.1(a)(1) | 7 |
| Loss Exceeding $150,000[7] | U.S.S.G. §2B1.1(b)(1)(F) | +10 |
| | | |
| GROUP 2: 18 U.S.C. § 1519 (Count Two) | | |
| Base Offense Level | U.S.S.G. § 2J1.2(a) | 14 |
| | | |
| GROUPING | | |
| Highest Offense Level | U.S.S.G. § 3D1.4 | 17 |
| Two Units Added | U.S.S.G. §3D1.4(a) | +2 |
| Acceptance of Responsibility | U.S.S.G. §3E1.1 | -2 |
| Timely Notice of Acceptance | U.S.S.G. §3E1.1 | -1 |
| **TOTAL ADJUSTED OFFENSE LEVEL** | | **16** |

Based on Oli's response to the initial PSR, the Government expects he will claim that he should benefit from a Zero-Point Offender adjustment under U.S.S.G. §4C1.1.  As the Probation Department properly concluded, he should not.  *See* ECF No. 25 at 12.

Oli has a prior conviction for driving a vehicle while impaired by alcohol in Maryland in 2019.  *See* ECF No. 22 at 12.  He pled guilty to that offense and was sentenced to a fully suspended 60-day sentence.  *Id*.  This conviction leads to one criminal history point for Oli.  *See* U.S.S.G.

---

[7] The parties agree that the loss amount attributable to Oli's criminal conduct is more than $150,000.  The Government informed the Defendant that in light of his pre-indictment guilty plea, the Government would not take further investigative steps to determine how much more than $150,000 the loss amount should be.

§4A1.1(c).  Because Oli has one criminal history point, he is ineligible for the Zero-Point Offender adjustment.  *See* U.S.S.G §4C1.1(a)(1).

Oli has informed the Probation Department that his Maryland conviction should not be counted because he "is in the process of filing a *coram nobis* as he may have been eligible for a reconsideration of sentence in Maryland pursuant to Maryland Rule 4-345."  ECF No. 24 at 2. That is not a basis to eliminate his criminal history point.  Whatever process Oli may be going through, he *currently* has a criminal history point for a valid sentence and conviction from a guilty plea.  In any event, only expunged convictions are not counted.  *See* U.S.S.G. §4A1.2(j); *see also United States v. Law*, 528 F.3d 888, 911 (D.C. Cir. 2008) ("[T]he federal Sentencing Guidelines do not count 'expunged' convictions for a defendant's criminal history, although the Guidelines do count set-aside convictions.") (citing §4A1.2(j) and collecting cases from the D.C. Circuit and six additional federal circuits).  There is no indication that Oli is going to have his prior conviction expunged.[8]  Because he has a criminal history point, he is not a zero-point offender under the guidelines, and his proper total adjusted offense level under the guidelines is 16.

A Total Adjusted Offense Level of 16 at a Criminal History Category I places Oli's guideline range at 21-27 months of incarceration.

## IV.   THE SECTION 3553(a) FACTORS SUPPORT A GUIDELINE SENTENCE

### a.  The Sentence Imposed Must Reflect the Seriousness of the Offense

The conspiracy to which Oli, Ogbu, and Crowell pled guilty was executed for several years and expanded over time.  The corrupt agreement originated with Oli in 2018 and was predated by his desire to make money through Highbury.  As the years passed, Oli continuously exploited

---

[8] Nor is there any concrete evidence that his *coram nobis* request will be successful.  *Cf. United States v. Ausby*, Case No. 72-cr-67 (BAH), 2019 WL 4737196, at *4 (D.D.C. Sept. 27, 2019) ("The writ of *coram nobis* is an 'extraordinary remedy' issued 'only in extreme cases.'") (citing *United States v. Danedo*, 556 U.S. 904, 916 (2009)).

Ogbu's and Crowell's willingness to misuse their government positions.  The contracts obtained differed, but the result was always the same: Highbury fraudulently obtain government business and Oli enriched himself.  As he admits, through this conspiracy Highbury improperly received over $1 million in funds originating from government contracts.  *See* Oli Stmt. at ¶ 1.

Based on the amount of time Oli committed to carrying out the conspiracy and his corruptly obtained contracts with WMATA and OCP, one can only assume that Oli's actual government employment duties at USDA suffered as a result.  Regardless, Oli clearly understood that to maintain his USDA employment (and his $130,000 annual salary from the agency) while bringing in over $1 million in fraudulently obtained Highbury contracts, he had to hide his conduct at WMATA and OCP from USDA.  So he lied, again and again, to his employer, to prime contractors, to contracting District agencies, and who knows how many other individuals.

The extents to which Oli went to carry out the conspiracy (for years) and then ensure it was not detected (for years) demonstrate the depth of his criminal motivation.  They also demonstrate the seriousness of his offenses.  Corruption and fraud in any form—no matter how passing or isolated—are serious.  The length and nature of Oli's criminal conduct makes his corruption and fraud even more alarming.  A guideline sentence is sufficient but not greater than necessary to reflect the seriousness of Oli's crimes.

### b.  The Sentence Imposed Must Afford Adequate Deterrence and Promote Respect for the Rule of Law

The type of criminal conduct in this case is serious because, among other things, it can corrode important government functions and erode public trust.  Those risks are magnified when corruption and fraud go unaddressed.  Those risks are mitigated through adequate deterrence and judicial action that unambiguously promotes respect for the rule of law.  That can and should be accomplished in this case through the imposition of a guideline sentence.

Government contractors and employees alike must be deterred from engaging in the sort of unapologetic criminal behavior that Oli exhibited for over half a decade.

Oli should also be specifically deterred from engaging in future fraud of any sort. His guilty plea and Statement of Offense clearly show how frequently he engaged in fraud as part of the conspiracy in this case. Other evidence amassed during this investigation shows that his willingness to engage in deception is not isolated to his conspiracy with Crowell and Ogbu. That in turn points to a need to specifically deter Oli from committing fraud in the future.

For example, Oli informed the Probation Department that Highbury did not have any employees other than him. *See* ECF No. 22 at 17. But he sought a loan under the Paycheck Protection Program ("PPP") and falsely claimed in loan application documents that Highbury had two employees. He also informed the Probation Department that he has only owned Highbury since 2018. *Id*. But the records demonstrate that he sought to do business as Highbury (which has always been <u>his</u> company) since 2015. And as late as January 2024—which was just weeks before he was approached by federal agents in relation to this investigation—he submitted perspective contracting documents to WMATA in which he stated that Highbury had been doing business under its present name for the prior eight years. Oli also told the Probation Department that he was unable to indicate the value of Highbury. *Id*. But Highbury maintained multiple active bank accounts through 2023 and federal agents found multiple records related to Highbury's income streams during the February 2024 execution of a search warrant on Oli's home.[9]

In sum, the need for a sentence in this case to adequately provide general deterrence is paramount. There is also a need for the sentence in this case to specifically deter Oli from engaging

---

[9] As noted in the Government's Opposition to Oli's Motion for Bond Modifications to Permit Travel Outside of the United States, Mr. Oli has a fake Nigerian driver's license that appears to have been created for his use. *See* ECF No. 14 at 2.

in future fraud or acts of deception.   A guideline sentence is sufficient but not greater than necessary to accomplish those important goals and to promote respect for the rule of law.

### c.   The Sentence Imposed Must Avoid Unwarranted Sentencing Disparities

The Government explained in its pre-sentencing submission for co-conspirator Crowell why a guideline sentence of 21-27 months incarceration is sufficient, but not greater than necessary, to avoid sentencing disparities with similarly situated defendants.  *See United States v. Crowell*, Case No. 24-cr-262 (TSC), ECF No. 15 at 13-14.  The same reasoning applies to the Government's request that the Court sentence Oli to a guideline sentence of 21-27 months.

It is also important that Oli's sentence not unjustifiably deviate from that of his co-conspirators.  When the conspiracy in this case is looked at in its entirety, each co-conspirator emerges as equally culpable.  Oli's individual conduct, relative levels of remorse, and personal characteristics do not justify a sentence lower than that of his co-conspirators.  To the contrary, a full assessment of the § 3553(a) factors in Oli's specific case may suggest that he should get one of the higher sentences among the three conspirators.

The Probation Department recommends that Oli be sentenced to 12 months and 1 day of incarceration.  *See* ECF No. 26.  This recommendation appears to be based entirely on the Judiciary Sentencing Information (JSIN) data for defendants with Criminal History I and a total offense level of 16 whose primary guideline was U.S.S.G. §2B1.1.  *Id*.; *see also* ECF No. 25 at 24.  It is not surprising that the overwhelming majority of defendants in this category have been sentenced to a period of incarceration—and, as the Probation Department recognizes, the same should be true here.  However, §2B1.1 covers all manner of fraudulent conduct, and it does not differentiate between individuals whose fraud also corrupted government agencies.  Nor does the JSIN comparison adequately reflect the temporal length and substantive depth of Oli's criminal conduct.

Yet the Probation Department's recommendation still goes *below* the average and median sentences for the defendants in that category.  Moreover, the Probation Department's recommendation reflects a sentence in a guideline range that would have been even lower than what Oli would have recieved if he had *only* been convicted of the falsification of records offense. The combination of a long-term conspiracy coupled with the fraud and corruption used to carry it out, plus separate and repeated falsifications of annual government ethics forms, makes a guideline sentence appropriate in this case.

### d. The Defendant's History and Characteristics

Oli's personal history and characteristics do not warrant a downward departure or variance from the already adjusted guideline range.

Oli grew up in a stable and supportive household.  He obtained a college degree.  As an engineer, he has marketable skills that allow him to make a comfortable living without engaging in fraud.

Despite his good fortune, Oli made an active choice to create, enter, and carry out a multi-year criminal conspiracy that he hid through at least annual acts of obstruction.  His long-term criminal conduct was serious.  As described above, his tendency to make false representations does not seem limited to the crimes at issue in this case.

Thus far, Oli's levels of remorse also seem materially lower than those of his co-conspirators.  Based on the information currently available to the Government, Oli does not appear to have much respect for the rule of law or its application to his life.

It seems the only conceivable reason to vary downward in Oli's case might relate to the effects that his incarceration would have on his family.  As the Government similarly explained with respect to Crowell, it is undoubtedly tragic that Oli's family is likely to suffer as a result of

his punishment.  But his conduct is to blame for that, and the risk that incarceration might harm his family was never enough to dissuade him from continuing his criminal behavior.  The only thing that stopped him was being caught.

Additionally, the Sentencing Commission has explained that "family ties and responsibilities are not ordinarily relevant in determining" whether a departure from a guideline range is appropriate.  *See* U.S.S.G. §5H1.6; *see also id.* at Application Note 1(B) ("The fact that the defendant's family might… suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.").

## V.      FORFEITURE & RESTITUTION

As part of his plea agreement with the Government, Oli has agreed to forfeit a black Mercedes sedan that he previously registered to Highbury and obtained through proceeds from his criminal conduct.  The parties have agreed to a joint proposed preliminary forfeiture order, which is attached to this memorandum as Exhibit 9.

Oli also agreed to pay restitution in the amount of $100,000 to the District of Columbia and $50,000 to WMATA.  *See* ECF No. 18 at 8-9.  The obligation to pay $100,000 to the District will be joint and several with both Ogbu and Crowell.  The obligation to pay $50,000 to WMATA will be joint and several with Ogbu.

Beyond the above, the Government is not seeking further forfeiture, restitution, or a fine in this matter.

**VI.      CONCLUSION**

Oli carried out a serious criminal conspiracy that enriched him at the expense of government agencies and the public's trust.  He was able to carry out that conduct for years by, among other things, repeatedly falsifying government records and deceiving multiple public agencies and officials.  A guideline sentence is sufficient but not greater than necessary to address those past acts and deter future misconduct by Oli and others.

The Government requests that Oli be sentenced to 21-27 months imprisonment, to be followed by two years of supervised release, along with the forfeiture of his Mercedes sedan and restitution in the amount of $100,000 to the District of Columbia and $50,000 to WMATA.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:      */s/ Timothy Visser*
TIMOTHY VISSER (DC Bar No. 1028375)
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-2590
timothy.visser@usdoj.gov