### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES** | * | |
| | * | |
| **V.** | * | **Case #: 1:24-CR-00275-TSC** |
| | * | |
| **IFEDIORA OLI** | * | |
| **Defendant** | * | |

**************************************

### POSITION OF THE DEFENDANT WITH RESPECT TO SENTENCING FACTORS AND DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

**COMES NOW,** Defendant, **IFEDIORA OLI,** by and through John 0. Iweanoge, II, and THE IWEANOGES FIRM, P.C., his attorneys, and submits this position of the defendant with respect to sentencing factors, pursuant to Court's policy regarding procedures to be followed in Sentencing, and in accordance with section 6Al.2 of the United States Sentencing Guidelines. His sentencing memorandum in support of a reasonable sentence in this case, is also incorporated herein.

### DEFENDANT'S REQUEST FOR A VARIANCE/DEPARTURE

Mr. Oli submits that there are factors in this case that warrant a vais nownce/departure based on the overrepresentation of criminal history and collateral consequences arising from this conviction for an individual who has worked his whole life, but now unemployed because of this felony offense.

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

*"[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance."[1]* Mr. Oli respectfully submits this

---

[1] *United States v. Adelson,* 441 F. Supp.2d 506 (S.D.N.Y. 2006) ("This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral

memorandum requesting that the Court consider his entire life and all that he has done in contemplating a sentence "sufficient but not greater than necessary" to satisfy all of the statutory purposes of sentencing.

Ifediora Oli is a father to two (2) toddlers, by his partner and a US Citizen with one prior criminal history point. He stands before this Court having accepted responsibility for role within a conspiracy to commit honest services fraud, and much of the funds for services provided either to DC Government and/or WMATA coming from his personal funds and/or loans from family and friends.

Given his role in the offense, his close relationship with his toddler son and daughter, their mother and his partner and significant other, and the devastating collateral consequences awaiting him as a result of his conviction in this case, a sentence of probation with home confinement followed by three years of supervised release and a requirement that he pay full restitution, jointly and severally with his co-defendants, is a sentence that is right and just in this case when all the factors set forth in 18 U.S.C 3553(a) are taken into account by this Honorable Court.

## THE COURT MUST IMPOSE A SENTENCE "SUFFICIENT BUT NOT GREATER THAN NECESSARY" TO COMPLY WITH THE PURPOSES OF 18 U.S.C. § 3553

As the Court is well aware, the guidelines are now advisory only, that is, one among a **number of factors to be weighed by the sentencing court.** *United States v. Booker,* 543 U.S. 220 (2005); *United States v. Price,* 409 F.3d 436, 443 (D.C. Cir. 2005) (noting that *Booker* excised mandatory Guidelines provision of 18 U.S.C. § 3553(b) but that§ 3553(a)'s specification of factors that guide federal sentencing, including application of Guidelines, remains in effect). As the *Price* Court stated, "[t]hese factors include, among others, the nature of the offense, the defendant's history, the need for the sentence to promote adequate deterrence and to provide the defendant with needed educational or vocational training, any pertinent policy statements issued

philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant'.")

by the Sentencing Commission, the need to avoid unwarranted disparities among similarly situated defendants, and the need to provide restitution to any victims." *Id.* at 442 (citing§ 3553(a)).

The most important consideration for the District Court in sentencing Mr. Oli must be the directive of Congress to "impose a sentence sufficient but not greater than necessary, to comply with [the purposes of sentencing]". 18 U.S.C. § 3553(a). *See e.g., United States v. Minisro-Tapia* 470 F.3d 137, 142 (2d Cir. 2006); *United States v. Yopp,* 453 F.3d 770, 774 (6th Cir. 2006); *United States v. Rodriguez-Rodriguez,* 441 F.3d 767, 770 (9th Cir. 2006); *United States v. Ranum,* 353 F. Supp.2d 984, 986 (E.D.Wis. 2005). While the standard on appeal is whether the sentence is reasonable, that is <u>not</u> the standard for the District Court. *United States v. Collington,* 461 F.3d 805, 807 (6th Cir. 2006) ("a district court's mandate is to impose 'a sentence sufficient, but not greater than necessary, to comply with the purposes' of section 3553(a)(2). Reasonableness is the *appellate* standard of review in judging whether a district court has accomplished its task."); *United States v. Foreman,* 436 F.3d 638, 644 n.1 (6th Cir. 2006) ("a district court's job is not to impose a 'reasonable' sentence. Rather, a district court's mandate is to impose 'a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2).

### I. Ifediora Oli's History and Characteristics

Mr. Oli was born and raised in a third world country of Nigeria and had to emigrate to the United States with his father, mother and sibling to get better educational opportunities. PSR at 91. With an extremely high population density, it is characterized by poor sanitation, poor access to safe water, dilapidated houses, open sewers, and many living below the poverty line.

Despite these odds, Mr. Oli upon emigrating to the United States at 16 years old, enrolled in the 11th grade and attended Springbrook High School in Silver Spring, Maryland.  Upon graduation from Springbrook High School, Mr. Oli immediately enrolled in Montgomery College

as a freshman in Rockville, Maryland in 2003. In 2005, he transferred to Howard University and graduated in 2007 with a Bachelor of Arts in Engineering.

Upon graduation, in 2008 he began his employment with Baltimore Gas and Electric as an engineer. In 2015, he joined the United States Department of Agriculture in Washington, DC as an engineer.  Following his arrest in this case, he has been placed on administrative leave by the government and expects to be terminated following his sentencing in this case.

In 2022, Mr. Oli met his partner and significant other, Ms Ebere, and their union was blessed with their daughter, who is 15 months old. On October 4, 2024, they welcomed their second child into the world, and he is 2 weeks old. Mr. Oli is the sole provider for the family as Ms. Ebere is unemployed and with the new addition to the family, he has been the daycare provider for their daughter. Ms. Ebere describes Ifediora as an "excellent father' who "loves his daughter immensely".

When not with his daughter, or assisting Ms Ebere with their new son, he is active in his local community. As a brother, friend and community member, he is described "a devout friend and an amazing father to his kids" "a caring person: See Sentencing Letters in support of Ifediora Oli, attached.

## II.        The Nature and Circumstances of the Offense

Mr. Oli has accepted responsibility for his role in the crimes before this Court. His involvement in these crimes came out of relationships and connections he had in his home country of Nigeria and subsequently, the United States.  He started talking to his friends about Government and Agency contracts but then unfortunately provided money to them in exchange for their perceived assistance in getting the contracts. Those types of acts and related schemes are, unfortunately, commonplace in West Africa.

For context, Mr. Oli was awarded the COVID supplies contract for $630, 000.00 by the District of Columbia Government but  they could not fund it and required his company to provide

the supplies with his own funds and to seek reimbursement upon the successful delivery of the required COVID supplies, which required him to seek out loans from friends and families, including co-defendant Mr. Ogbu to fulfill the terms of the contract, The government claims that Mr. Oli was paid over $1 million by the government, which means that they are assuming that Mr. Oli procured the required supplies for free from manufacturers , which is not true.

Mr. Oli paid for the goods and services that he supplied to DC Government during the COVID national pandemic, as well as services to WMATA and deserving  of credit towards the loss amount under USSG  2B1.1, application note 3(E) for goods returned to the creditor during the course of the offense, and may explain why the parties agreed to  a loss amount of $150, 000.00  in consideration that Mr. Oli did not make $1 million in contracts from DC government and/or WMATA in this case.

Honest service payment, which is looked upon as a way to say, thank you, in hopes of getting more lucrative government and agency contracts in the future, is so prevalent and has become so normalized among some West African communities including Nigeria, that many participate in it, even when they might be the lowest bidder in a government and agency contract and the bidding process gives you a high percentage of being awarded the contract, which was the case in the DC Government COVID contract. While this aspect of West African culture certainly does not excuse Mr. Oli' s conduct, it does help put it into context.

Mr. Oli's role in these offenses was that of a contractor. He provided the required goods and services under the DC Government during the COVID crisis and/or WMATA under the direction of a prime contractor. Of the money that was paid by the DC Government and/or WMATA, Mr. Oli's "profit" stands in stark contrast to the amount of restitution, and amount of loss for purposes of the guidelines, applicable in this case, and should be considered a mitigating factor.

### III.   The Kinds of Sentences Available

A sentence must address the "kinds of sentences available." 18 U.S.C. §3553(a)(3). Prison is just one kind of sentence available in this case. There is no mandatory period of incarceration required. Incarceration is just one *tool* the Court can use in fashioning a sentence here, and it is a tool that should be used as a last resort. In 2016, a bipartisan Congressional task force wrote, "Incarceration is a highly punitive, costly, and potentially harmful intervention that should be used sparingly and judiciously." Charles Colson Task Force on Federal Corrections, *Transforming Prisons, Restoring Lives: Final Recommendations of the Charles Colson Task Forde on Federal Corrections,* at 20 (January 2016), available at http://www.urban.org/research/publication/transforming-prisons-restoring-lives/view/full_report. Here, the Court has other less costly and less harmful options than incarceration, and Mr. Oli asks this Court to consider options such as probation with home detention and supervised release here.

### IV.   The Sentencing Guidelines

In this case, there is no dispute that Mr. Oli has one criminal history point, which we will argue is an overrepresentation of his criminal history, placing him in criminal history category I. PSR at 82. However, we disagree with Probation's calculation of the guidelines, and object to the failure to give him a 2-level departure in the offense level under §4C1.1. PSR at 76. As expressed in the defendant's original objections to the PSR, the defense objected to probation's original failure in not applying a 2-level reduction to the US sentencing guidelines calculation under the theory of zero-point offender. *See* Defendant's Objection to PSR, ECF Doc. 24.

Departures Based on Overrepresentation of Criminal History.

Under U.S.S.G. § 4A1.3, the court may make appropriate adjustments if the criminal history is overstated.

> In deciding whether to depart undersection 4a1.3, the district court must specifically address the adequacy of a defendant's criminal history category as it reflects both the defendant's past. Criminal conduct and

> likely criminal future the purpose of section 4a1.3 is to allow a district court to deviate from the otherwise applicable [g]uideline range where a defendant's criminal history, likelihood of recidivism, or both differ significantly from the typical offender for whom the applicable criminal history category was formulated. In other words, a district court may depart when a defendant's criminal past or likely criminal future removes the defendant from the heartland of the applicable criminal history category.

United States v. Collins, 122 F.3d 1297, 1304 (10th Cir. 1997).

The Guideline contemplates that criminal history might be overstated if there is no other evidence of prior criminal behavior in the intervening period, that is, between two convictions. Section 4A1.3 of the Sentencing Guidelines authorizes a downward departure from the guideline range if a defendant's criminal history is overstated.

The one criminal history point on Mr. Oli's record dates back to 2019, which is five (5) years ago for a misdemeanor traffic violation of operating while impaired. For context, while he was represented by counsel, a review of the Maryland Case Search indicates that his counsel didn't file a motion for reconsideration of sentence under Maryland Rule 4-435.

That would give him an opportunity for probation before judgment under Maryland Rule 6-220, which if granted by the Court, would've given him an opportunity to expunge his record that accounts for the one criminal history point in this case. Mr Oli through undersigned counsel is filing a coram nobis petition in Montgomery County District Court to correct this error.

Under these circumstances, Mr. Oli is deserving of this Court's consideration by departure or variance as a zero-point offender under USSG 4C1.1, which will result in a 2-level reduction in his total offense level from 16 (21-27 months) to 14 (15-21 months).

## V.     Criticism of Fraud Guidelines Generally

In this case, U.S.S.G. § 2 B l.1 provides for an 10-level increase to the offense level based on economic loss. It does not consider Mr. Oli's motivations for engaging in the conspiracy, or any of his individual characteristics. A sentencing process driven largely by a finding of loss, as in

this case and in most fraud cases, ignores many important elements of Section 3553(a). See *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (noting that "the Sentencing Guidelines for white-collar crimes [can produce] a black stain on common sense"); *United States v. Adelson*, 441 F. Supp. 2d 506,512 (S.D.N.Y 2006), *aff'd 301* Fed. Appx. 93 (2d Cir. 2008) (lamenting "the utter travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense).

Indeed, Courts have often recognized that the financial guideline is crude and frequently ill-fitting. As Judge Rakoff poignantly observed in *United States v. Gupta*, 904 F.Supp.2d 349,350 S.D.N.Y. 2012).

> The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and tlw attempt to do so can only lead to bizarre results.

Judge Rakoff observed in an earlier decision, "[a]s many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors:" *Adelson*, 441 F.Supp.2d at 510, *citing generally* Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998). In *Adelson*, Judge Rakoff ultimately imposed a sentence of three and one-half years, notwithstanding an advisory guideline range of life imprisonment. The Court called the Guidelines "wildly off-base," *id* at 515, and called attention to "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings *if **not cabined by common sense.**" Id.* at 512

8

(emphasis added); *see also United States v. Musgrave,* 647 F. App'x 529, 538 (6th Cir. 2016). ("[T]here is reason to believe that, because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances.").

Judge Rakoff observed that the "vast increase in white collar sentencing was partly mandated by Congress, reacting in turn to public outcry over such massive frauds as Enron and WorldCom," and noted that "in implementing the Congressional mandate, the Sentencing Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense." *Id.*

In a concurring opinion in *United States v. Corsey,* 723 F.3d 366, 379-80 (2d Cir. 2013), Judge Underhill echoed these same observations:

> The Sentencing Commission set the original 1987 Guidelines for economic offenses higher than historical sentences in order to further the deterrence and just punishment goals of sentencing. In 1989, in response to the savings and loan crisis, Congress passed legislation increasing the maximum penalties for financial fraud offenses and directing the Sentencing Commission to include specific offense characteristic enhancements in the fraud guideline ... In 2001, the Sentencing Commission amended the Guidelines to combine the fraud, theft and embezzlement, and property destruction guidelines into a single guideline, section 2B 1.1. That change was accompanied by the publication of a new loss table that had the effect of increasing offense level calculations, especially for high-dollar value crimes... Most recently, the fraud guideline was amended in 2003 in response to Congressional directives in the Sarbanes-Oxley Act. Those amendments included further changes to the loss table that added offense level points in the highest loss cases. The three sets of amendments to the loss table of the fraud guideline alone have effectively multiplied several times the recommended sentence applicable in 1987 for large-loss frauds, which itself was set higher than historic sentences.

*Corsey,* at 379-80 (internal citations omitted). *See also United States v. Musgrave,* 647 F. App'x 529, 538 (6th Cir. 2016) ("[T]here is reason to believe that, because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, ***it is particularly appropriate for variances."*) (emphasis added).

Scholarship has also focused on the sentences for fraud offenses and whether judges are strictly following Guidelines calculations in such cases. A former staff attorney to the U.S. Sentencing Commission engaged in a review of empirical data of federal sentences, observing that "[i]t appears that in practice, loss has very little correlation to the ultimate sentence imposed, regardless of how it determines the advisory guideline range." Mark H. Allenbaugh, *"Drawn from Nowhere: A Review of the US. Sentencing Commission's White Collar Sentencing Guidelines and Loss Data,"* 26 Fed. Sent'g Rep. 19, 23 (2013). Further, the author notes that "the data suggests that loss is an unsound measure of the seriousness of many offenses, with the result that judges are increasingly willing to go below the Guidelines when they impose sentences in white-collar cases." *Id* at 19. Ultimately, the author concludes that "judges are rightly rejecting Guideline recommendations that are driven excessively by loss" and that "the fraud Guidelines themselves are in need of a thorough revision, which should start with a reconsideration of the definition and role of loss." *Id* "[L]oss should fundamentally be reconfigured starting with what the Commission is most experienced with-empirical data." *Id* at 26.

Sentencing Commission data also reflects what can only be described as broad judicial discomfort with guideline sentences in fraud cases. Thus, it is widely recognized that the offense level called for by the sentencing guidelines in these types of cases is, more often than not, a blunt proxy for measuring the appropriate punishment. "[W]hile there are times that quantity is an entirely appropriate proxy for culpability, at other times it is not ... in many cases the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Pimental,* 367 F.Supp.2d 143, 156 (D. Mass. 2005) (internal quotation and citation omitted). For these reasons, in this case, the guidelines should be given less weight than in other cases in fashioning a just sentence. Rather than solely tethering Mr. Oli's sentence to the overall loss amount here, he asks this Honorable Court to consider his

individual characteristics, and to vary downward from this loss-driven guideline.

###### VI.     *The Need to Avoid Unwanted Sentencing Disparities*

The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct is codified in 18 U.S.C. § 3553(a)(6). The U.S. Sentencing Commission provides limited data of dispositions for defendants whose primary guideline was U.S.S.G. *§* 2Bl.l and indicates the average sentence for defendants with Mr. Oli's total offense level and his Criminal History Category.   This data, however, excludes certain categories of defendants, including those cases where defendants were sentenced to time-served sentences, which potentially and significantly skews the results. As a result, it may be difficult for the Court to draw easy comparisons between those cases and this one. However, the data reflects that more than half of all offenders sentenced under Mr. Oli's guideline sentencing range and the 2B1.1 Guideline in recent years received a downward departure and/or downward variance. Thus, Mr. Oli's request for a below-guideline sentence in this case is supported by the statistics and data from the Sentencing Commission.

Generally, a non-jail sentence, even with the loss amount at issue in this case, finds support in other dispositions and judgments in this district and nationally. *See Defendant's Exhibit 1.*

In 822 cases nationally, 123 (15%) received probation and in 8 cases in the District of Columbia, 2 (25%) received probation. And in 5 cases in precise guideline calculation nationally, 2 (40%) received probation.



| | Total No. of Cases | Defendants Receiving Probation | Defendants Receiving Prison 1 Day | Defendants Receiving Prison >1 Day | Average Sentence | Median Sentence |
|---|---|---|---|---|---|---|
| **National TOL 16** | 822 | 123 (15.0%) | 86 (10.5%) | 613 (74.6%) | 12.2 mo. | 12 mo. & 1 day |
| **District of Columbia TOL 16** | 8 | 2 (25.0%) | 0 (0.0%) | 6 (75.0%) | 12.1 mo. | 13.5 mo. |
| **National Precise Guideline Calculation** | 5 | 2 (40.0%) | 0 (0.0%) | 3 (60.0%) | 5.0 mo. | 4.0 mo. |
| **District of Columbia Precise Guideline Calculation** | 0 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | n/a | n/a |

The table is titled:

**Summary of Findings for Ifediora Oli**
**Guilty Pleading, Criminal History Category I Defendants**
**Who Did Not Receive USSG §5K1.1 Departure**
**Scored According to USSG §2B1.1**
**2015 or Later Guidelines Manual**
**(Excludes Defendants Subject to a Statutory Mandatory Minimum Sentence)**
**National – FY 2016 - FY 2023**

## VII    The Needs a Sentence Must Fulfill

As in all sentencing proceedings, the Court's determination comes down to deciding what punishment is fair, necessary, and appropriate, given all of the relevant facts and circumstances. "Imposing a sentence on a fellow human being is a formidable responsibility," compelling "a court to consider, with great care and sensitivity, a large complex of facts and factors." *United States v. Gupta,* 904 F. Supp. 2d 349,350 (S.D.N.Y. 2012). The Court must conduct a "more holistic

inquiry" than simply plugging numbers into a guidelines calculation, and "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle." *United States v. Yonathan Rodriguez,* 527 F.3d 221,228 (1st Cir. 2008) (citing *Kimbrough v. United States,* 128 S.Ct. 558, 570 (2007)). That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id.* In reaching a decision on what constitutes an appropriate sentence, the district court should "consider all the relevant factors" and "construct a sentence that is *minimally sufficient* to achieve the broad goals of sentencing." *Id* (emphasis added).

In addition to consideration of other §3553(a) factors, such as the nature and circumstances of the offense, Mr. Oli's history and characteristics, and the guideline sentencing range, all addressed above, the Court must fashion a sentence that satisfies the four needs a sentence must fulfill. Put simply, those needs are punishment, deterrence, incapacitation, and rehabilitation. *See* 18 U.S.C. §3553(a)(2). For Mr. Oli, a sentence of probation, with home confinement, with three years of supervised release and restitution, fulfills those needs.

The first purpose of sentencing is to "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." Certainly, this case is serious, and Mr. Oli acknowledges that people were affected by the actions he and others took in this case. However, his punishment should be proportional to his role and the acts he committed as part of this conspiracy, as well as the consequences that will befall him now that he has pled guilty and been convicted of the instant crimes here.

In considering whether further incarceration is necessary in this case in order to punish Mr. Oli for his crimes, this Court can and should consider the collateral consequences now awaiting Mr. Oli.  Having pled guilty, Mr. Oli not only has a criminal record for the first time for a felony

conviction in his life and is a convicted felon.[2]

       In light of the uniquely punishing nature of his impending collateral consequences, further incarceration would be unduly punitive. In Mr. Oli's situation, incarceration would instead exacerbate the already devastating effects his conviction will have on his young family. It would delay his ability to provide much-needed financial support to his two young children and push him deeper into arrears with his mortgage, loan payments and childcare as his partner and significant other will be stretched thin and remain unemployed. It goes without saying that his children, who are just toddlers, will suffer too without their father in their life. Numerous studies have shown the effect that incarceration has on children. *See* Anne R. Traum *"Mass Incarceration at Sentencing,"* 64 Hasting Law Journal 423, 433, (2013) ("Incarceration isolates parents from their children, removes financial and caregiving support for the children, and imposes on the family the cost, time, and stress of maintaining a relationship with an incarcerated parent.") "Associated sociological and criminological theories point to three prominent ways in which the effects of parental imprisonment on the social capital of children might be understood. These involve the strains of economic deprivation, the loss of parental socialization through role modeling, support, and supervision, and the stigma and shame of societal labeling." John Hagan and Ronit Dinovitzer, *"Collateral Consequences of Imprisonment for Children, Communities, and Prisoners",* Crime and Justice, vol.

---

[2] Generally speaking, the fact that Mr. Oli has been prosecuted for a felony offense in federal court, and will live with that felony conviction forever, serves to reflect the seriousness of the offense and promote respect for the law. A felony conviction changes one's status in this country forever. It comes with significant collateral consequences. Courts have recognized that the stigma of a felony conviction constitutes punishment in and of itself. *See United States* v. *Prosperi,* 686 F.3d 32, 48 (1st Cir. 2012) ("Sometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed" ); *United States v. Stewart,* 590 F.3d 93, 141 (2d Cir. 2009) ("the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment of the defendant"); *United States v. Smith,* 683 F.2d 1236, 1240 (9th Cir. 1982) ("The stigma of a felony conviction is permanent and pervasive."); *see also* Wayne A. Logan, "Informal Collateral Consequences," 88 Washington Law Review 1103 (2013) ("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation    beyond the grave").

26 (1999), 121-162, 123. "The financial difficulties and loss of a parent precipitate a range of emotional and psychological problems that affect these children, including educational failures, aggression, depression, and withdrawal." *Id.* at 137-138. Even government-sponsored studies have for many years recognized the need for alternatives to incarceration that minimize the damage suffered by children, reduce recidivism, and increase family preservation. Ross D. Parke & K. Alison Clarke-Stewart, *Effects of Parental Incarceration on Young Children* (Dec. 2001) (commissioned by U.S. Dept. of Health and Human Services as part of its From Prison to Home: The Effect of incarceration on Children, Families and Communities project); Child Welfare League of America, Parents in Prison: Children in Crisis (1997). The Court can properly consider the effect Mr. Oli's incarceration would have on his toddler son and daughter in fashioning a sentence. *See, e.g., United States v. Lehmann,* 513 F.3d 805 (8th Cir. 2008) (where defendant convicted of felon in possession and where guidelines 37-46 months, district court's granting of downward departure or variance to probation with 6 months in half-way house proper after *Gall,* because of devastating effect mother's imprisonment would have on defendant's 8-year old son who was already suffering from trauma of accidental death of his sister who found and discharged the firearm); *United States v. Chambers,* 885 F.Supp. 12, 14 (D.D.C. 1995) (defendant is single mother with two children ages 12 and 15, incarcerating defendant for 15 years would deprive children of sole parent "that children need supportive and loving parents to avoid the perils of life is without question ... causing needless suffering of young, innocent children does not promote the ends of justice"); *United States v. Hammond,* 37 F.Supp.2d 204 (E.D.N.Y. 1999) ( "A sentence without a downward departure would contribute to the needless suffering of young, innocent children").

The life Mr. Oli worked so hard to build in this country has forever been destroyed with this conviction. His incarceration and separation from his children will cause him emotional suffering without end. In short, Mr. Oli is now experiencing, and will continue to experience,

punishment for his crimes in ways that go beyond the sentence this Court will impose, and that should be taken into account in determining what additional measure of punishment is appropriate here. Although Mr. Oli will face additional difficulties as he resettles without his federal government employment, any future struggles will pale in comparison to the loss he will have to endure, beginning a new life without income, health insurance and benefits for, his toddler son and daughter, and their mother, his partner and significant other. The thought of enduring a life apart from his toddler children if he is incarcerated is excruciatingly painful, and the heartbreak of this unavoidable separation from his federal employment with benefits, as one of the collateral consequences of this conviction, is a form of punishment that will stay with Mr. Oli for the rest of his life.

As to deterrence, the recommended sentence would have an "adequate" deterrent effect on both the general public and Mr. Oli. Determining the sentence that would "adequate[ly]" deter criminal conduct is appropriate because over a decade's worth of research indicates that while certainty of being caught and punished produces a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels ... reached that conclusion, as has every major survey of the evidence." *Id.;* see also Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime,* 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").; Steven N. Durlauf & Daniel S. Nagin, *Imprisonment and Crime: Can Both be Reduced?,* 10 Criminology & Pub. Pol'y, 37 (2011); Raymond Pastemoster, *How Much Do We Really Know About Criminal Deterrence,* 100 J. Crim. L. & Criminology 765, 818 (2010); Daniel S. Nagin, *Deterrence in the Twenty-First Century,* 42 Crime & Just. 199,201 (2013).

In sum, empirical studies have shown that longer sentences have minimal or no benefit on whether potential offenders commit crimes. The National Academy of Sciences (NAS) concluded that there is insufficient evidence justifying policy choices on the assumption that harsher punishments yield measurable deterrent effects, and that all leading surveys of the deterrence research reach the same conclusion: that 'potential offenders may not accurately perceive, and may vastly underestimate, those risks and punishments associated with committing a crime.[3]

Indeed, as a first-time felony offender, it is in fact likely that Mr. Oli's arrest, prosecution, and conviction will be deterrence enough. For over many months, Mr. Oli has shown that his arrest and prosecution in this case have deterred him and that he has successfully abided by all court- ordered conditions, including curfew, indicating that there is no need to incarcerate Mr. Oli out of concerns for public safety or to deter him from future criminal conduct. Data collected by the Sentencing Commission demonstrates that offenders, like Mr. Oli, have a lower recidivism. Tracey Kyckelhahn & Trishia Cooper, U.S. Sentencing Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* (2017). Like many offenders in the position of Mr. Oli, he should be given some benefit of the doubt that this criminal prosecution will be sufficient to deter him from future criminal behavior.[4] Finally, it cannot be ignored that Mr. Oli's impending experience of the unwanted collateral consequences he will suffer are, in itself, a significant deterrent in and of itself. Mr. Oli recognizes that, but for his own incredibly flawed decision-making, he would not be facing the reality of a felony conviction.

---

[3] Brennan Center for Justice, What Caused the Crime Decline? (26 Feb. 2015), available at: https://www.brennancenter.org/publication/what-caused-the-crime-decline

[4] Courts have recognized a first-time offender's low risk of recidivism as grounds for a below-guideline sentence. *See, e.g., United States v. Urbina,* 2009 WL 565485, *3 (E.D.Wis. Mar. 5, 2009) (considering low risk of recidivism  indicated by defendant's lack of criminal record, positive work history, and strong family ties).

There is also no rehabilitative value for a sentence any longer than that proposed. Indeed, Congress itself has "recognize[ed] that imprisonment is not an appropriate means of promoting correction and rehabilitation." *See* 18 U.S.C. *§* 3582(a). Mr. Oli has no serious mental illness or substance use disorder history that requires intervention or treatment.

Thus, this crucial sentencing goal cannot be adequately fulfilled by any sentence of imprisonment in this case.

Although a period of incarceration would certainly exist to incapacitate him further, the costs cannot be justified. Instead, additional carceral time would prolong his separation from his young family, diminish his potential earning capacity, isolate him from developing pro- social connections in the community, delay his productive contribution to society, and risk exacerbating his physical and mental health. It would offer no additional deterrent or rehabilitative value, stymie meaningful retribution, and subvert the additional sentencing goals of 18 U.S.C. § 3553(a)(2). For these reasons, Mr. Oli asks this Court to impose the requested sentence.

## Restitution/Forfeiture

Mr. Oli agrees that restitution applies in this case and that it is $150, 000.00 with joint and several liability with his co-defendants, Obinna Ogbu and Bridgette Crowell. Mr. Oli in good faith prior to his sentencing, will be paying fifty thousand dollars towards his restitution in this case. Additionally, Mr. Oli agrees to forfeit Highbury's automobile.

### Need to Provide Restitution to Victims of the Offense

In determining the appropriate sentence, this Court must consider "the need to provide restitution to any victims of the offense." *See* 18 U.S.C. §3553(a)(7); *see also, e.g*., *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (acknowledging district court's discretion to depart from guidelines to impose probationary sentence, since the "goal

of obtaining restitution for the victims of Defendant's offense . . . is better served by a non-incarcerated and employed defendant"); United States v. Peterson, 363 F. Supp. 2d 1060, 1061-62 (E.D. Wis. 2005) (granting a variance so that defendant could work and pay restitution).

The victims in this case are entitled to restitution, and Mr. Oli wishes to provide it. He is college-educated, hardworking, and a particularly talented person. He was a highly successful electrical engineer with the US Department of Agriculture for almost a decade. There is every reason to believe that he can obtain a reasonably paying job. If Mr. Oli were sentenced within the advisory guideline range, he would find it very difficult to re-enter the workforce, while facing possible foreclosure as his partner and significant other is presently unemployed, with two toddlers. At that point, with his family facing foreclosure and him homeless, that would make it nearly impossible for him to make any restitution.

This Court should seek to maximize, rather than eliminate, Mr. Oli's ability to make the restitution that the victims are entitled to, required by law and he's agreed to pay starting with fifty thousand dollars to be paid before sentencing in this case.

## Conclusion

This Court should "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States,* 518 U.S. 81, 113 (1996). Ifediora Oli is a dedicated and loving father and partner, who made the poor and misguided decision to commit the crimes before this Court. He has come to realize the seriousness of those crimes, has accepted responsibility for his actions, and will experience the collateral consequences of his convictions for the rest of his life. As such, the requested sentence herein, of probation with home confinement and/or home detention is a just sentence for Mr. Ifediora Oli.

Defendant by Counsel
Ifedora Oli

Respectfully submitted,

THE IWEANOGES' FIRM, P.C.

By:_____/s/JohnOIweanogeII/s/_____
John O. Iweanoge II (DC Bar #439913)
Iweanoge Law Center
1026 Monroe Street, NE
Washington, D.C. 20017
Phone: (202) 347-7026
Fax: (202) 403 - 3903
Email: joi@iweanogesfirm.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of October 2024, I electronically filed the foregoing

with the Clerk of Court using the Courts CM/ECF electronic filing system, which will then send a

notification of such filing (NEF) constituting service to all parties and attorneys of record.

/s/JohnOIweanogeII/s/_____
John O. Iweanoge II